IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD C. ANGINO and ANGINO & ROVNER, P.C., | : : : | No. 1:05-cv-380 |
| Plaintiffs, | : : | |
| v. | : : | Judge Jones |
| COREGIS INSURANCE COMPANY, COREGIS GROUP, WESTPORT INSURANCE CORPORATION, and GE INSURANCE SOLUTIONS | : : : : : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

**July 21, 2005**

## THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Plaintiffs Richard C. Angino and his law firm Angino & Rovner, P.C.

("Angino" or "Plaintiffs") have filed this diversity action pursuant to 28 U.S.C. §

1332 alleging that Defendants Coregis Insurance Company, Coregis Group,

Westport Insurance Corporation, and GE Insurance Solutions (collectively

"Westport" or Defendants") acted in bad faith in refusing to settle a legal

malpractice action against the Plaintiffs, in violation of 42 Pa. Cons. Stat. § 8371.

Defendants have filed a timely Motion to Dismiss (Rec. Doc. 7) which has been

1

fully briefed by the parties and is now ripe for our review.

For the following reasons, we will grant Defendants' Motion and Plaintiffs' complaint will be dismissed with prejudice.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY:

The facts underlying this action developed over a fourteen-year period.  In 1990, Angino initiated legal representation of Tania Workman ("Workman") in a medical malpractice action in the Clinton County Court of Common Pleas. Following a 1994 mistrial, in 1996 a jury returned a verdict in Workman's favor. The jury awarded a total of $123,000, including $23,000 for Workman's medical expenses and $100,000 for her future medical expenses.  However, there was no verdict returned for loss of future earnings, as this standard damage request was omitted from the verdict form.

Workman's trial counsel, Angino, admits to having not included a request for future earnings on the verdict form he submitted to the court.  Immediately after the trial, Angino informed his malpractice insurance carrier, Westport, of his mistake and Workman's potential legal malpractice claim against the Plaintiffs.[1]  At the time, a legal malpractice policy insuring Plaintiffs and issued by Westport with limits of $4,000,000 that included a $50,000 deductible per incident was in effect.

---

[1] Angino's attempts to get Workman a new trial via the appellate process proved unsuccessful.

This policy states, in relevant part, that:

> [T]he Company shall:
>
> A.    have the right and duty to defend, including selection of counsel and arbitrators, in any INSURED's name and on any INSURED's behalf any CLAIM for DAMAGES against any INSURED, ... and shall have the right to make such investigation, negotiation and settlement ... of any CLAIM as it deems expedient.
>
> B.    not settle any CLAIM without the written consent of the NAMED INSURED which consent shall not be unreasonably withheld.

(Cmplt. Ex. A ¶ II.A)(emphasis in original)(the "Policy").

Immediately following the October 1996 trial in which the admitted malpractice occurred, Angino advised Westport that a claim by Workman against Angino for the future lost income she was never awarded as a result of Angino's error could be valued from $250,000 up to $750,000. Anecdotal interviews with jurors after the conclusion of the trial indicated that they were inclined to award future economic damages up to $1,000,000 but obviously could not in the absence of a verdict question allowing them to do so.[2]  At the trial, testimony from an actuarial expert estimated Workman's lost income as between $261,807 and

---

[2] Defendants object to Angino's mention of this evidence on hearsay and relevance grounds. We agree to the extent that we do not find this evidence relevant to our resolution of the pending Motion. We reference it only to fully explain what was understood by the parties during the pendency of the malpractice litigation.

$776,898.  Angino also informed Westport that he would, in effect, testify against himself in any malpractice action brought against him by Workman.  (Letter from Richard C. Angino to Westport of October 28, 1996, Rec. Doc. 16 at 6-7)("[T]his is the first time I feel I made a mistake that has the potential to cost my client money.  I am committed to obtaining a just result.").

Following the Pennsylvania Superior Court's denial of Workman's appeal seeking a new trial, Angino again attempted to get Westport to settle Workman's claim.  In several letters to Westport in the spring of 1998, Angino provided a qualified consent to settle the claim for a minimum of $250,000, and up to $500,000, and suggested that the claim might be resolved if some form of alternative dispute resolution ("ADR") was employed.  He also stated that if Workman's claim went to trial, it might result in a verdict in excess of $400,000. For example, Angino stated in his letter of February 28, 1998:

> I will not, however, consent to a settlement or pay any underlying money unless the settlement is fair to Tanya ($250,000-$500,000).  I made a mistake.  You and I are responsible for that mistake.  I cannot as a matter of ethics and integrity agree to an unfair settlement involving a minor.

(Letter from Richard C. Angino to Westport Ins. Co. of February 26, 1998, Rec. Doc. 16 at 8).  Despite Angino's entreaties, Westport declined ADR at that point and did not settle the case, as it valued the claim at only $50,000.  Westport Claims

4

Specialist Dawn Goeres states in her affidavit that Westport only valued

Workman's claim at $50,000 "given the speculative nature of the underlying

experts' reports." (Goeres Aff. ¶ 9). Workman then initiated a lawsuit in the

Dauphin County Court of Common Pleas on October 7, 1998 against Angino and

his law firm, which was defended by the Defendants, as Angino's malpractice

insurer.

From the time of his letter notifying Defendants of the potential malpractice,

Angino never consented to a settlement **below** $250,000 until October 2000 when

he then consented to a settlement of not less than $200,000 that included his

$50,000 deductible. Id. ¶ 5. However, this $200,000 consent was short-lived. In

October 2001, on the eve of a what otherwise might have been a productive

mediation session, Angino altered his consent such that he refused to pay the

balance of his entire $50,000 deductible towards the total settlement. (Id. ¶ 6)(Br.

Reply Mot. Dismiss ¶ 11)("Angino consented to settlement ... with the qualification

that Angino would not consent if it had to pay any additional money, although at

this time Angino had not satisfied the Policy's deductible."). This no doubt

reduced the efficacy any mediation process would have had on resolving this

dispute, since Westport could not at that point count on receiving the full

deductible from Angino.[3]  Once again, the case did not settle.

Following discovery in the legal malpractice lawsuit and a failed motion seeking to exclude admission at trial of the original trial experts' reports, Westport reevaluated the case in June 2004 and determined at that time that the claim was worth $175,000.  (Goeres Aff. ¶ 10).  Nonetheless, the case proceeded to a bench trial in June 2004 after which Judge John F. Cherry of the Dauphin County Court of Common Pleas awarded Workman $174,400.  Shortly after the trial's conclusion, Workman effectuated a compromise settlement with Westport for $164,000 in November 2004.  Angino paid the balance of his $50,000 deductible, which was approximately $18,000, in January 2005.[4]  Subsequently, Angino filed the instant action in the United States District Court for the Middle District of Pennsylvania on February 22, 2005.  (See Rec. Doc. 1).

Plaintiffs aver that Defendants engaged in bad faith by "unreasonably ... refusing to settle [Workman's] case" and by "placing their own interests above the

---

[3] It is not controverted that Angino's consent was necessary in order for Defendants to settle Workman's claim.  As previously noted, the Policy stated that consent of the insured "shall not be unreasonably withheld."  (Policy at 1).  We note without comment that Westport does not argue that Angino's withholding of consent below $250,000 and later $200,000 was unreasonable pursuant to the Policy.

[4] The remaining amount of Plaintiffs' $50,000 deductible was exhausted via the approximately $31,000 in litigation costs that Defendants incurred in litigating Workman's claim against Plaintiffs. (Angino Aff. ¶ 27; Rec. Doc. 16).

interests of their insured, particularly dragging out the case for 7 years and earning an invested return that probably equaled the pay-out figure." (Cmplt. ¶¶ 39-46). They also allege that Defendants' bad faith caused Plaintiffs to spend in excess of $31,000 in defending the claim, in addition to "valuable time and office resources" that were lost. Finally, Plaintiffs claim that Defendants' refusal to settle caused Plaintiffs to experience "adverse publicity." Id.

## STANDARD OF REVIEW:

The parties have referred to matters outside the pleadings via submitted affidavits. Therefore, Defendants' Motion to Dismiss shall be treated as a motion for summary judgment. See Fed. R. Civ. P. 12(b)(6). A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). The party moving for summary judgment bears the burden of showing "there is no genuine issue for trial." Young v. Quinlan, 960 F.2d 351, 357

(3d Cir. 1992).  Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences which a fact finder could draw from them.  See Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir. 1982).

Initially, the moving party has a burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corporation v. Catrett, 477 U.S. 317, 323 (1986).  This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial. See id. at 325.

Rule 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e).  The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor.  See Celotex, 477 U.S. at 322-23 (1986).

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact." Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511

8

(3d Cir. 1994)(citation omitted).  However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)(internal citations omitted).

Still, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)(emphasis in original).  "As to materiality, the substantive law will identify which facts are material."  Id. at 248.  A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

**DISCUSSION:**

Defendants contend first that the Plaintiffs have failed to state a claim upon which relief may be granted because they do not allege a prima facie case of bad faith against the Defendants.  Second, Defendants argue that even if Plaintiffs have alleged a prima facie case of bad faith, they have not alleged any damages. Because we find that Plaintiffs have failed to allege a prima facie case of bad faith, we need not resolve this second question.

Although no cause of action exists at common law for a bad faith claim against an insurer, in 1990 Pennsylvania enacted 42 Pa. Cons. Stat. § 8371, which states:

> In an action arising under an insurance policy, if the court finds that the **insurer has acted in bad faith** toward the insured, the court may take all of the following actions:
> (1)     Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> (2)     Award punitive damages against the insurer.
> (3)     Assess court costs and attorney fees against the insurer.

(emphasis added).  This statute was intended to mirror the Pennsylvania Supreme Court's opinion in D'Ambrosio v. Pennsylvania Nat'l Mut. Casualty Ins. Co., 431 A.2d 966 (Pa. 1981).  As noted by both parties, the Pennsylvania courts, in defining "bad faith," have adopted the definition found in Black's Law Dictionary for this phrase:

> "Bad faith" on part of an insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Terletsky v. Prudential Property and Casualty Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994)(quoting Black's Law Dictionary 139 (6th ed.1990)). Therefore, the

obvious question before the Court is whether Defendants' actions in not settling this claim more quickly "breach[ed] a known duty" in a malicious manner that went beyond "mere negligence or bad judgment." MGA Ins. Co. v. Bakos, 699 A.2d 751, 754-55 (Pa. Super Ct. 1997). Furthermore, the party attempting to prove bad faith must do so by "clear and convincing" evidence. Cowden v. Aetna Cas. & Sur. Co., 134 A.2d 223, 229 (Pa. 1957)("bad faith must be proven by clear and convincing evidence and not merely insinuated").

To determine whether bad faith exists, we apply a two part test. See Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997)(citing Terletsky v. Prudential Property & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1995)). Both elements of the Terletsky test must be satisfied by clear and convincing evidence: "(1) whether the insurer lacked a reasonable basis for denying benefits; and (2) whether the insurer knew or recklessly disregarded its lack of reasonable basis" in denying the claim. Id.; see also Keefe v. Prudential Property & Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000).[5]

At first blush, we are presented with an underlying legal malpractice claim against Angino wherein he immediately admitted fault, but which then protracted for

---

[5] It is somewhat surprising to the Court that the Plaintiffs failed to cite to the Klinger test in their Brief in Opposition, as Angino himself had argued the Klinger case before the Third Circuit.

over seven years without resolution.  However, our first task is to determine

whether Defendants had a reasonable basis for not concluding the malpractice

claim during the extended interval.  At the time the malpractice occurred in 1996

and as previously noted, Plaintiff Angino informed Defendants that their possible

exposure could be greater than $500,000.  Despite this opinion by Angino, the case

was ultimately settled for $164,000.  Moreover and as previously stated, we find it

highly material that from the inception of the claim until October 2001, Plaintiffs

never gave their consent to settle the malpractice action for less than $200,000.

Accordingly, Westport accomplished a settlement which was approximately

$36,000 less than the floor Plaintiffs themselves had placed on any monetary

resolution.

In face of the above, Angino alleges that Defendants' delay is an indication

that they did not have a reasonable basis in failing to settle Workman's claim.

However, delay is not, alone, an indication of bad faith.  See Kosierowski v.

Allstate Ins. Co., 51 F.Supp.2d 583, 589 (E.D.Pa. 1999)("Delay is a relevant

factor in determining whether bad faith has occurred, but a long period of time

between demand and settlement does not, on its own, necessarily constitute bad

faith. Rather, courts have looked to the degree to which a defendant insurer knew

that it had no basis to deny the claimant; if delay is attributable to the need to

12

investigate further or even to simple negligence, no bad faith has occurred."). Here and as noted, Plaintiffs make repeated references to the time between the occurrence of the malpractice and the settlement of the claim, which admittedly was an extended period. However, an appropriate analysis of Plaintiffs' claim can only be accomplished by examining the salient facts which took place within the relevant period.

It is clear to us that any delay in resolving the underlying case prior to at least October 2001, was in the main attributable to Angino's refusal to consent to a settlement less than $200,000. Notwithstanding this, Plaintiffs endeavor to buttress their claim by calling into question Defendants' initial $50,000 valuation of Workman's claim. However, we find this point unavailing as it relates to Defendants' alleged bad faith, since Angino himself refused to consent to a settlement below amounts which were greatly in excess of that initial valuation. Clearly, Angino persistently established several high settlement "floors" and in doing so discouraged any attempts by Westport to resolve the claim beneath those amounts. We accordingly believe that Angino's own obdurate behavior in this regard removed much of Westport's incentive to raise its valuation of the case or to engage in more extensive investigation, unless and until it met Angino's valuation threshold. Notably, even when Angino consented to a settlement for an amount

below $250,000 in October 2000, his consent was short-lived.  As previously

noted, in October 2001, it appears that Angino withdrew any consent for Wesport

to settle unless he did not have to tender any of his remaining deductible.  (Reply

Br. at ¶ 11).  Giving Angino some benefit of the doubt as to his motivation, we

assume that at least in part he was seeking what he considered to be appropriate

recompense for his former client, Ms. Workman.  However, on these facts it is

impossible for us to find any basis for a bad faith claim against Defendants for at

least the period from the inception of the claim in 1996, until October 2001.  The

unreasonably low valuation Angino alleges on the part of Westport is a "red

herring" in the factual matrix, as Angino had tied Westport's hands at a settlement

"floor" at least four times in excess of that amount until October 2001.

Therefore, we must turn to an analysis of whether Defendants proceeded in

bad faith in not settling Workman's claim from the ensuing period of October 2001

through November 2004, when Westport finally settled with Workman.  As

previously noted, the Terletsky court explained that the Plaintiffs must show that

Defendants "lacked a reasonable basis for ... denying payment ... and that

[Defendants] recklessly disregarded a lack of reasonable basis."  Terletsky, 649

A.2d at 689-690.  From October 2001 through June 2004, when Westport raised its

valuation to $175,000, we do not believe that Angino can show, by clear and

convincing evidence, that either prong of the bad faith test is satisfied.  Plaintiffs

simply allege in their complaint that "Defendants acted unreasonably in refusing to

settle this case."  (Cmplt. ¶ 44).  In their various other submissions, we see no

evidence that Westport acted unreasonably.[6]

During the final period of approximately two-and-one-half years prior to

settlement, the legal malpractice action proceeded through the Dauphin County

Court of Common Pleas in a fashion which appears not distinctly different from

any other similar tort case.  Looking at events subsequent to October 2001 in

isolation, we do not find the delay to be excessive.  Rather, after a review of the

docket of the underlying case, the pendency of that action appears ordinary and

customary.  (See Civil Action Docket # 98-S-4463; Rec. Doc. 1 Ex. B).  Moreover

and most importantly, Plaintiffs have not directed us to a single act or omission on

Defendants' part, other than the extended time period and valuation as noted, in

support of their bad faith claim.

To reiterate, an initial review of this matter reveals what appears to be a

potentially problematic duration of seven years between the initial claim by

Workman and settlement of the underlying legal malpractice action.  However, an

---

[6] For example, Plaintiffs state that "[a]n insurer should attempt to settle before litigation" but this bald assertion, without more, is certainly not evidence of bad faith.  (Br. Opp. Mot. Dismiss at 8; Rec. Doc. 16).

examination of the record gives lie to Plaintiffs' assertion of bad faith.  While it is somewhat customary for a plaintiff to engage in ardent discovery of a defendant's files in bad faith actions, affidavits have been submitted and we thus have no reason to believe that any additional facts would be developed, nor do we believe that Plaintiffs desire to uncover other facts via discovery in support of their cause of action other than what we have before us.  Accordingly, and to quote William Shakespeare, Plaintiffs' claim is "... full of sound and fury, signifying nothing..." The delay in settling Workman's claim is fully explainable.  With reference to Terletsky, Defendants' conduct did not evince a "... frivolous or unfounded refusal to pay proceeds of a policy ..."  Id. at 688.  Although we frankly cannot find evidence of even negligence or bad judgment by Westport, Terletsky guides us that in the event we so found, it would not be sufficient to save Plaintiffs from dismissal of their suit.

Finally, while any analysis of damages is unnecessary given the dismissal of Plaintiffs' claim, we are compelled to make a closing observation.  Plaintiff Angino and his firm are eminently successfully lawyers known to this Court as having good reputations for professionalism.  To be sure, incidents of the type which triggered the underlying legal malpractice claim can and will happen to even the best practitioners, and when they do some reputational harm is bound to result.

However, Angino continued to be an advocate for his former client Workman after the legal malpractice was committed by him.  If any lesson can be learned here, it is that a compulsion to conflate one's personal interest in resolving a malpractice claim with an attempt to seek maximum redress for a former client should be resisted.  Angino's clear lack of objectivity impaired Defendants' reasonable attempts to manage and resolve Workman's claim.

There is no genuine issue as to any material fact, and as a matter of law Defendants are entitled to judgment in their favor on Plaintiffs' bad faith claim.

## THEREFORE, IT IS HEREBY ORDERED THAT:

1.    Defendants' Motion to Dismiss (Rec. Doc. 7), which the Court will treat as a motion for summary judgment under Fed. R. Civ. P. 56(c), is GRANTED.

2.    Plaintiffs' Complaint is DISMISSED with prejudice.

3.    The Clerk of Court shall Close the file on this case.


s/ John E. Jones III
John E. Jones III
United States District Judge